**BENJAMIN KIM, OSB 066426**
333 SW Taylor St., STE 400
Portland, OR 97034
Tel: (503)344-6251
Email: benkimlaw@me.com

**BERT DUPRÉ, OSB 055233**
Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238
Portland, OR 97214
Tel: (503) 701-3188
Email: bert.dupre@gmail.com

Attorneys for Ronald Clayton Rhodes

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>RONALD CLAYTON RHODES,<br><br>    Defendant. | **NO. 3:19-CR-00333-MC /**<br>**NO. 3:22-CR-137-MC**<br><br><br>**DEFENDANT RHODES MOTION FOR NEW TRIAL / MOTION FOR JUDGMENT OF ACQUITTAL** |

Pursuant to Fed. R. Crim. P. 33, as well as the Due Process Clause of the Fifth Amendment to the United States Constitution, defendant Ronald Rhodes moves this Court for a new trial. The interest of justice requires a new trial because those convictions are based in material part on the perjured testimony of government witness Javier Hernandez. Given Hernandez' false testimony—and the jury's apparent reliance on it—the interest of justice requires a new trial.

Second, Mr. Rhodes moves this Court for a judgment of acquittal pursuant to Fed. R. Crim. P. 29. Mr. Rhodes was convicted of three counts. Count 1 alleged RICO Conspiracy; Count 6 alleged VICAR murder in furtherance of the RICO conspiracy; Count 7 alleged Using and Carrying a Firearm During a Crime of Violence (18 USC § 924 (c)). Mr. Rhodes moves for a judgment of acquittal on each of these counts.

Third, Mr. Rhodes renews his due process arguments base on *Napue v. Illinois*, 360 U.S. 264, 269 (1959) that were raised after the government rested.

Finally, Mr. Rhodes joins in Lorenzo Jones' post-trial motions and arguments therein, to the extent that they are relevant to Mr. Rhodes' case.


## ARGUMENT

## I. MOTION FOR NEW TRIAL

### A. Legal Standards for Motion for New Trial

#### 1. A motion for new trial should be granted where "the interest of justice requires."

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed R. Crim. P. 33 (a). "A motion for new trial pursuant to Rule 33, Fed. R. Crim. P., is addressed to the sound discretion of the trial judge." *United States v. Antone*, 603 F.2d 566, 568 (5th Cir. 1979). A defendant may combine a motion for new trial under Rule 33 with motion for acquittal under Rule 29. *United States v. Rojas*, 574 F.2d 476 (9th Cir. 1978). Under Rule 33, a district court may grant a new trial "if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." *United States v. Lacey*, 219 F.3d 779, 783 (8th Cir. 2000) (quoting *United States v. Brown*, 956 F.2d 782, 786 (8th Cir. 1992)).

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

## 2. The standards for assessing a new trial motion are different than a motion for judgment of acquittal.

The standards for a new trial motion are different than a motion for judgment of acquittal. There may be evidence sufficient for a rational juror to find guilt beyond a reasonable doubt, yet the interest of justice requires a new trial. *United States v. Autuori*, 212 F.3d 105, 108 (2d Cir. 2000) ("[W]e conclude that there was evidence sufficient for a rational juror to find Autuori guilty beyond a reasonable doubt, but that the district court did not abuse its discretion in granting a new trial, for which purpose we remand.").

Unlike a motion for judgment of acquittal, in a motion for new trial "the court need not view the evidence in the light most favorable to the government, but may instead weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v. Luna*, 265 F.3d 649, 651 (8th Cir. 2001). "In ruling on the Rule 33 motion, the district court was in the best position to evaluate the witnesses' credibility and weigh the evidence." *Id.* at 651. See also, *Autuori*, 212 F.3d at 120 ("In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses.") (citing *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *Autuori*, 212 F.3d at 120 (quoting *Sanchez*, 969 F.2d at 1414). Exceptional circumstances may exist where the "credibility of the principal witness was weak and that the soundness of the verdict is highly doubtful." *Autuori*, 212 F.3d at 121.

## 3. A conviction based on perjured testimony is manifestly unjust and requires a new trial.

Mr. Rhodes acknowledges that the grant of a new trial is extraordinary. However, such a motion should be granted where necessary to prevent manifest injustice. *United States v.*

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

*Robinson*, 430 F.3d 537, 540 (2d Cir. 2005).  Put another way, a district court may grant a motion for new trial where "the district court ultimately determines that a miscarriage of justice will occur."  *United States v. Maybee*, 687 F.3d 1026, 1032 (8th Cir. 2012) (quoting *United States. v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002)).  This is such a case.  Mr. Rhodes was convicted of VICAR murder in Count 6, which carries a mandatory sentence of life in prison.  18 U.S.C. § 1959(a)(1).  Convicting and sentencing Mr. Rhodes to life in prison based on perjured testimony is manifestly unjust.

The Ninth Circuit has set forth distinct standards for assessing a new trial motion where a conviction may have been obtained through perjured testimony.  In *United States v. Young*, 17 F.3d 1201, 1203 (9th Cir. 1994), the Ninth Circuit enunciated the proper analysis in a motion for new trial based on perjured testimony:

> We review a district court's decision not to grant a motion for a new trial for abuse of discretion.  *United States v. George*, 960 F.2d 97, 101 (9th Cir. 1992); *United States v. Endicott*, 869 F.2d 452, 454 (9th Cir. 1989).  **However, "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have effected the judgment of the jury."**  *United States v. Agurs*, 427 U.S. 97, 103, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976).

*Young*, 17 F.3d at 1203 (emphasis added).  *Young* involved testimony regarding a search of defendant's vehicle where papers were found which tended to indicate methamphetamine manufacturing.  *Id*. at 1202.  Young testified that the papers were not his and that he had moved some papers from a co-defendant's truck that he was helping tow.  *Id*. at 1202.  The officer who conducted the search of the vehicle happened to be on vacation during trial, but a second officer testified about that search.  *Id*.  The officer testified that the papers were taped under the dashboard of a truck.  *Id*.  The prosecutor argued in closing that this tended to indicate that defendant was hiding them and was guilty.  After trial, when the officer who searched the vehicle

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon  97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

returned from vacation, she informed the parties that she had found the papers in a paper bag in the cab of the truck—not taped to the bottom of the dashboard. *Id*. at 1202-03.

Without determining whether the false testimony was intentional or not, the *Young* court reversed the conviction, finding that there was a reasonable probability that the result would have been different without the false testimony.

> The appearance of misconduct in this case is serious. Young presented competent evidence that the prosecutor knew Sheldon's testimony was false. Officer Amicone testified under oath that she told the prosecutor where she found the notebooks and Chem Lab cards. She said this conversation took place during the trial, shortly before she left for vacation, in which case it occurred shortly before Sheldon testified. Prosecutors not only presented Officer Sheldon's false testimony but referred specifically to it during closing arguments.

> The government argues that no misconduct occurred, contending that the prosecutor did not know Officer Sheldon's testimony was false and that Officer Sheldon did not deliberately commit perjury. It emphasizes that it came forward with the evidence promptly after the trial and that the prosecutor stated that she did not recall the conversation with Officer Amicone. It argues that the district court must have resolved these credibility issues in favor of the prosecutor and that this credibility determination is not clearly erroneous.

> **However, a government's assurances that false evidence was presented in good faith are little comfort to a criminal defendant wrongly convicted on the basis of such evidence.** A conviction based in part on false evidence, even false evidence presented in good faith, hardly comports with fundamental fairness. Thus, even if the government unwittingly presents false evidence, a defendant is entitled to a new trial "if there is a reasonable probability that [without the evidence] the result of the proceeding would have been different." *Endicott*, 869 F.2d at 455 (citing *United States v. Bagley*, 473 U.S. 667, 678-80, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985)).

> Reviewing the record in its entirety, we find a reasonable probability that the result would have been different had the government not presented Officer Sheldon's false testimony. Young is therefore entitled to a new trial, whether or not the prosecutor knew Sheldon's testimony was false and whether or not Officer Sheldon committed perjury or was simply mistaken.

*Young*, 17 F.3d at 1203-04.

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

The Ninth Circuit has followed the standards set forth in *Young* in subsequent cases.  For example, in *United States v. Sanchez*, the Ninth Court stated that "**different standards apply when the defendant premises his new trial motion on the prosecution's use of perjury.**  266 F. App'x 579, 581-82 (9th Cir. 2008) (emphasis added).  The Ninth Circuit went on apply *Young's* two-part standard, depending on whether the perjury was used knowingly by the prosecution.  *Id.* (citing *Endicott*, 869 F.2d at 455; *Bagley*, 473 U.S. at 682).  See also *United States v. Dorsey*, No. CR08-245RSL, 2017 US Dist LEXIS 180368, at \*10-11 (WD Wash Oct. 31, 2017); *United States v. Pelisamen,* 641 F.3d 399, 407 (9th Cir. 2011).

### B.  The Perjury of Javier Hernandez

   1.  **Hernandez lied repeatedly and knowingly to law enforcement and then perjured himself at grand jury and trial.**

Javier Hernandez is not simply a witness with credibility issues.  Make no mistake—Hernandez committed perjury at this trial.  The perjury involved intentionally lying about material issues, and the prosecution either knew or reasonably should have known his testimony was false.  And there is a reasonable probability that the result of the trial would have been different if the government had not presented this perjured testimony.

This court has already noted that Hernandez lied—repeatedly and knowingly:

You know what I'm fearful about is the fact that none of these proffers were recorded.  **I think it's amazing quite frankly that the government allowed this person to lie, knowingly lie, repeatedly, and fail to record these proffers**.

So we can talk all about the ethics of this case if you'd like, but I can tell you **this is the most surprising reliance on a witness I have seen in terms of prior, not**

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon  97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

**inconsistencies, but knowledge of prior lying to the grand jury, to law enforcement.** Wide latitude for the defense on this witness."[1]

9/26/2022 Hernandez Testimony at 106-107 (emphasis added). Later, when Ms. Bolstad argued that the government believed that Hernandez had "over owned" his lies, this Court replied, "***I don't think Mr. Hernandez can over own lying***…" 10/6/2022 Parenti Testimony at 41.

Hernandez lied repeatedly to prosecutors and law enforcement during his proffers—even though doing so violated the terms of his proffer agreement with the government. Those lies included the most material aspects of this case, such as stating that Rhodes pulled the trigger in the Polk shooting and that Hernandez was not present at the Page shooting. Following a pattern that would continue through the trial, Hernandez would admit to a lie only after being confronted with irrefutable evidence. These lies in the proffers—even though they were not under oath— may be considered by this court when assessing Hernandez' credibility; the overall unreliability of his testimony; the "interest of fairness" in allowing a conviction to be based on that testimony, *see* Fed. R. Crim. P. 33; and the due process implications of the same, *see Napue v. Illinois*, 360 U.S. 264, 269 (1959). However, for purposes of these motions, we will concentrate on the provable instances of perjury when Hernandez testified under oath at grand jury and trial.

---

[1] While defense counsel appreciates "wide latitude" in cross-examinations, that latitude does not make up for the false testimony that was presented to the jury. And counsel would find later that the same "wide latitude" was extended to the government—even though it was the government that had created to the situation by presenting a witness who was known to repeatedly lie. As a result, this court allowed the government's rehabilitation of Hernandez through Agent Parenti (including multiple vouching attempts) and admitted Hernandez' grand jury testimony virtually in its entirety. Thus, pointing out the falsehoods in Hernandez' testimony somehow resulted in even more false testimony being admitted and considered by the jury.

Page 7 of 38 – DEFENDANT RHODES MOTION FOR NEW TRIAL / MJOA

**2. Hernandez committed perjury when he testified at grand jury and trial that he only sold marijuana prior to meeting Rhodes and joining the Hoovers.**

Hernandez lied under oath repeatedly about his drug selling. At grand jury, Hernandez testified that he never sold any drugs other than marijuana prior to meeting Rhodes and joining the Hoovers. Further, Hernandez testified that he did not even know how to sell drugs before meeting Mr. Rhodes and joining the Hoovers.

Q. "Did you know how to deal drugs beforehand, or did somebody show you the ropes on how to deal drugs?

**A. I didn't know how to sell drugs. I really didn't know how to survive. I didn't know, like, the survival without having a job. I learned everything from Rhodes,** from selling drugs to getting money from other women, you know —"

Hernandez Grand Jury Testimony, Govt Exh 126 at 20-21 (emphasis added).

At trial, Hernandez told a similar story. At trial, Hernandez described his pre-Hoovers drug selling experience as follows:

Q. Okay. At some point right after you dropped out of high school, did you start selling drugs to make money?

A. I sold weed just to maintain my weed habit, and that's pretty much it, just to -- just to smoke.

9/23/2022 Hernandez Testimony at 8. Hernandez repeated this under cross-examination:

Q. And you told the grand jury and you kind of told us yesterday that Mr. Rhodes taught you how to sell drugs; right?

A. Yeah.

Q. And you told the grand jury -- well, I think you specifically told the grand jury that you didn't know how to sell drugs and that Mr. Rhodes taught you; right?

A. Yeah.

Q. Words to that effect; right?

A. Yeah.

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

Q. And you still stand by that statement; right?

A. Yeah.

Q. Because you never really sold drugs until Mr. Rhodes; right?

A. Just weed. I never sold no heroin or nothing like that before.

9/26/2022 Hernandez Testimony at 40-41.

As this court likely recalls, this grand jury and trial testimony was proven to be false—which Hernandez eventually admitted. During cross-examination, Mr. Kim confronted Hernandez repeatedly with proof that Hernandez was heavily involved in selling all kinds of drugs prior to meeting Rhodes or joining the Hoovers. First, Mr. Kim pointed out that Hernandez' timelines did not match up and that Hernandez obtained his heroin supplier prior to meeting Rhodes. Here, Hernandez did not admit lying. Instead, Hernandez offered a ridiculous story that he lied to law enforcement about selling heroin to make himself look good—though he could not come up with a reason why that would have benefitted him.

Q. And you said after you and Mr. Rhodes had your falling out, after the death of Kyle Polk, that you used Nick as a source for heroin; right?

A. Right.

Q. When did you first meet Nick?

A. Earlier in the new year of 2016.

Q. Sir, do you remember speaking with -- during the August 28 first proffer meeting?

A. Yeah.

Q. Didn't you tell the prosecutors that you had gone to Las Vegas, spent all your money, and then started dealing with Nick, buying heroin from him and selling it?

A. Yeah.

Q. So you just told us that you never sold heroin, you just -- until Mr. Rhodes. You just told us that you met Nick in 2016 after Mr. Rhodes, but on August 28th you

told prosecutors that after this Las Vegas trip in June, July, you had lost all your money and so you started dealing heroin; right?

A. Right. I mean, that whole proffer I feel like I lied.

Q. So you were lying about the heroin as well?

A. Yeah.

Q. You were lying to the prosecutors that you sold heroin to make yourself look better; is that what you're telling us?

A. Yeah. That proffer, yeah.

Q. How would admitting -- how would telling prosecutors that you sold heroin help you?

A. I mean, at that time I was trying to protect myself.

Q. How does telling prosecutors, lying that you sold heroin, how does that protect you?

A. I don't know. It doesn't.

Q. I don't think it does. And then on the third proffer on April 14th of 2021, don't you tell the prosecutors again that after you lost your money in Vegas a white guy that used to be a customer started to supply Javier with drugs and started fronting him seven ounces at a time, and that person being Nick, right?

A. Yeah.

Q. So August 28th you're lying about your heroin dealing to protect yourself, you say, even though it -- you know, you can't explain how it protects yourself, but then on April 14 of 2021 you're still telling that story; right?

A. Yeah. I guess.

Q. Because the fact is you did sell heroin before – you were selling drugs long before Mr. Rhodes; isn't that true?

A. No, sir.[2]

_____

[2] It was established during trial testimony that Hernandez joined the Hoovers in fall of 2015. But according to Hernandez himself, he went to Las Vegas with Ben Fettig before he joined the Hoovers. During this trip, "CD3 spent all his money in Las Vegas NV during the trip with Fettig

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

Q. That's not true?

A. Huh-uh.

9/26/2022 Hernandez Testimony at 42-43.

Next, Mr. Kim confronted Hernandez with Facebook messages showing even more explicitly that he was selling far more than marijuana prior to meeting Mr. Rhodes and becoming a Hoover. Hernandez relented finally and admitted that he had lied under oath:

Q. Okay. Because you only sold weed; right?

A. Yeah. Weed. I probably bought some Xanax pills, but I didn't sell nothing at that time.

Q. So you did sell oxy?

A. No, I said I purchased Xanax pills. I bought some, but I never sold.

MR. KIM: Okay. Can I have a moment, Your Honor?

THE COURT: Yes.

MR. KIM: 418 for the witness, please.

BY MR. KIM:

Q. Sir, this is a Facebook page. You've seen – the government's already shown you other Facebook pages that look very similar to this. Do you see that?

A. Yeah.

Q. And you see the -- the people in this document, Stoney Flyckoon; that's you, right?

A. Yeah.

* * * * *

_____

and started selling heroin to support himself. After the trip CD3 started buying heroin from a white guy named Nick who also lived in the apartments." Exhibit M, Proffer 1, at 2.

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

Q. That's you, Stoney Flyckoon, and you're texting or sending a message to Gabriel Jimenez, "I got OxyContin and oxycodone," right?

A. Yeah.

MR. KIM: Can you blow up that part? There we go.

Q. And then he says, "Both, homey"? And you say, "I got 80 of OxyContin 40's and seven oxycodone," right?

A. Yeah.

Q. So you're selling oxycodone and OxyContin; right?

A. Yeah.

**Q. So when you just told us that you buy pills, but you don't sell them, you just lied to us; right?**

**A. Yeah.**

9/26/2022 Hernandez Testimony at 43-44 (emphasis added). Mr. Kim continued,

MR. KIM: Offer 420.

MR. SINGH: No objection.

THE COURT: It will be received.

(Exhibit No. 420 received.)

MR. KIM: Page 2. Top of the page, the first half of the page.

BY MR. KIM:

Q. So, again, this conversation is on August 22nd of 2015; right?

A. Yeah.

Q. Well before you ever met Mr. Rhodes; right?

A. Yeah.

Q. And you're -- you're calling them footballs, but you're talking about pills; right?

A. Yeah.

Q. So you're selling pills on August of 2015; right?

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon  97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

**A. Yeah.**

Q. So you were selling them back in January, February; you're still selling them back in August; right?

A. Yeah.

Q. You would agree with me, sir, that you're actually selling a lot of pills, a lot of weed, a lot of Xanax bars, all the stuff that you said that you only buy, you were actually selling; right?

**A. Yeah, I was selling them. I wouldn't say a lot though. I wouldn't say I had a quantity of pills, but yeah, I sold.**

**Q. Okay. That's not what you told the jury today. You specifically said you never sold that stuff; you only bought it; right?**

**A. Right.**

9/26/2022 Hernandez Testimony at 47-48 (emphasis added).  Mr. Kim continued and confronted Hernandez with more Facebook messages showing him selling drugs prior to meeting Rhodes. Hernandez admitted to doing so, though he continued to deny that he sold heroin prior to becoming a Hoover.  9/26/2022 Hernandez Testimony at 49.

> **3.  Hernandez committed perjury when he testified that he only sold two firearms and that it was after he met Rhodes and joined the Hoovers**

A similar pattern emerged regarding Hernandez' sales of firearms.  Hernandez testified at grand jury and trial that he only sold two firearms and that it was within the context of the Hoovers gang.  At grand jury, Hernandez' testimony was as follows:

Q.  Do you remember ever selling firearms?

A.  Ah, yeah, I sold a couple, like, a few.

Q.  Did you, like, advertise them or post them on the Internet for sale?

A.  Yeah, sold them to people that weren't in my circle; like on Facebook, I messaged a couple people that had nothing to do with Hoover, kind of sold them outside the circle, so they weren't in it, because they were probably dirty.

Page 13 of 38 – DEFENDANT RHODES MOTION FOR NEW TRIAL / MJOA

Q. So the reason to sell the guns -- can you explain to the grand jury the reason to sell the guns outside of the Hoover circle?

A. So that if anybody gets caught with them, you know, no crimes or shootings come back to them or, you know, they don't have to deal with it, it's gone somewhere else.

Q And by "dirty", you mean that gun was probably used to commit a crime?

A Yeah.

Hernandez Grand Jury Testimony, Govt Exh 126 at 25-26. Although somewhat indirectly,

Hernandez certainly implied that he sold the firearms during his time with the Hoovers.

At trial, Hernandez repeated this testimony, but testified more directly that he only sold

two firearms, and that it was as a Hoover.

**Q. Did you ever engage in selling firearms?**

**A. Yeah.**

**Q. And where did you get these guns that you were selling?**

**A. From other Hoovers.**

**Q. How many guns do you think you sold in total?**

**A. A couple.**

**Q. Just a couple?**

**A. Yeah.**

Q. Who were these Hoovers who you got these guns from?

A. Ben.

Q. Ben -- and Ben is Ben Fettig?

A. Yeah.

Q. Okay. And?

A. Antoine Patterson.

Q. Okay. And who did you sell these guns to?

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

A. People outside the circle that I went to high school with.

Q. Okay. So you -- you did than try to sell those guns within Hoover?

A. No.

Q. Why not?

A. Because they were most likely used in a -- in a crime, so I didn't want to put them back in the circle, or you don't sell things back in the circle, or, you know.

9/23/2022 Hernandez Testimony at 46-47 (emphasis added). Thus, at trial the government elicited testimony that Hernandez only sold two firearms, and that these were obtained and sold during his time as a Hoover. *Id.*

On cross-examination, Hernandez testified as follows:

Q. Okay. But these are -- as you told us yesterday and you said right now, these are the only guns that you've sold; correct?

A. Yeah, for these --

Q. Okay. So did Mr. Rhodes teach you how to sell guns?

A. No.

Q. You learned that through the Hoovers, though; right?

A. I mean, you kind of just ask, is -- you know, who wants to buy a gun.

BY MR. KIM:

Q. 422. Again, sir, this is more of your Facebook; right?

A. Yeah.

Q. Stoney Flyckoon, around the time of February 1, 2015;

correct?

A. Yeah.

MR. KIM: Offer 31 -- offer 421.

THE COURT: 422.

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

MR. KIM: Or 422.

MR. SINGH: No objection.

THE COURT: 422 will be received.

(Exhibit No. 422 received.)

BY MR. KIM:

Q. And then on the third from the bottom you typed to

Gabriel Jimenez, "Who is trying to buy a smack"; right?

A. Yeah.

Q. A smack is a gun; right?

A. Yeah.

Q. So on February 23rd of 2015, you're trying to sell a gun; right?

A. Yeah.

**Q. So did you just lie to us again that those were the only two guns you sold?**

**A. Yeah.**

9/26/2022 Hernandez Testimony at 53-54 (emphasis added). After showing Hernandez several

instances of the same type of gun sales prior to meeting Rhodes or joining Hoovers, Hernandez

admitted again that he lied under oath:

> Q. Okay. So you said you sold two guns, and then when -- and you said you met
> Ben Fettig in May or June, and when I showed you your January or February post,
> you said, "Oh, no, maybe I met Ben earlier." So that's that gun? This is the second
> gun; right? Or is this just another gun you sold? Is this just another gun you sold,
> sir?
>
> A. I don't know. It might be the same gun. I don't know.
>
> Q. Did you -- have you sold so many guns that you can't keep track?
>
> A. No, it's just it's been a long time.
>
> Q. But when you told this jury that you only sold two guns, you lied; right?

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

A. I said a couple, but –

**Q. You lied, didn't you, sir, under oath?**

**A. Yeah.**

9/26/2022 Hernandez Testimony at 57-58 (emphasis added).

   **4. There is further evidence of perjury by Hernandez in his Facebook messages.**

  There is even further evidence of perjury in Hernandez' Facebook messages than what was offered and admitted at trial. Hernandez was deeply involved in criminal activity and was well-versed in gang culture at least as early as 2014 (which is as far back as the Facebook messages that exist). Exhibits H, I, J, K, L Hernandez Facebook Messages 2014-2015. Hernandez sold all sorts of drugs long before meeting Rhodes or joining the Hoovers. The messages also show that he is involved in recruiting women for prostitution. See, e.g., Exh H at 28-33.

  Additionally, in these Facebook messages there is evidence that Hernandez wanted to buy a 9mm Glock with an extended clip a year before the Polk murder. Exhibit H at 51-56. In a series of messages on 10/25/2014, Hernandez says, "I need that G23" (referring to the 9mm Glock). *Id*. at 53. He also asks, "Do they make extendos for that." *Id*. Of course, Hernandez' interest in a 9mm Glock with an extended clip is relevant because that is the exact weapon he used to shoot and kill Kyle Polk. This was a full year before Hernandez met Mr. Rhodes. The jury never heard this evidence. The government may argue that it is the fault of the defense that this evidence was not shown to the jury. And it is true that defense counsel did not spot this exchange until after the trial.

  However, these Facebook messages had been in the possession of the government since 2016. It is the prosecutor's responsibility—not the defendant's—to ensure they do not introduce

Page 17 of 38 – DEFENDANT RHODES MOTION FOR NEW TRIAL / MJOA

perjured testimony. *Endicott*, 869 F.2d at 455 ("[W]hether the nondisclosure is a result of negligence or design, it is the responsibility of the prosecutor.") (citing *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 764, 31 L. Ed. 2d 104, 106 (1972)). Here, the prosecution did not do the bare minimum required to ensure that they would not present false testimony. At a bare minimum, the prosecution should have recorded the proffers after Hernandez lied throughout the first proffer. Yet, the government decided to continue to meet with Hernandez without recording the interviews and failed to confront Hernandez about statements that ran contrary to other strong evidence.

> 5. **Hernandez committed perjury when he testified that Rhodes was the person who spoke with Kyle Polk and Javonni Matthew.**

The most crucial part of Hernandez' testimony was his testimony regarding the Kyle Polk homicide. Hernandez testified that in addition to driving the car, Rhodes was the person who engaged Javonni Matthew and Kyle Polk in conversation, asked them where they were from, gave the 9mm to Hernandez, and told Hernandez to shoot. Regarding this testimony, the government knew that there were two eyewitnesses who disputed that account.

Matthew told police repeatedly and consistently that it was the lighter- skinned passenger in the car who spoke with Matthew and Polk—not the darker-skinned driver. Matthew testified to this effect at trial. A second witness to the event, Deonna Mitchell, corroborated Matthew's account. On March 30, 2016, Detectives Brad Clifton and Anthony Merrill interviewed Deonna Mitchell. Clifton described Mitchell's statements, in relevant part, as follows:

> Mitchell saw that the front passenger window of the white Escalade was down and she could hear words exchanged between the front passenger and Polk. Mitchell said she couldn't hear what was being said. Michell said she could see two people in the Escalade, the front passenger and the driver, however she later said someone could have been in the backseat but was not sure. Mitchell said she

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

saw the front passenger point a gun out the front passenger window and shoot at Polk. Mitchell said the gun was black appeared to be big with an extended clip.

Exhibit E, Clifton Report of Mitchell interview. Mitchell was on the government's witness list but informed the defense at the last minute that they would not be calling her. After the government dropped Mitchell as a witness, the defense attempted to subpoena her. The defense is required to serve a Federal witness subpoena through the U.S. Marshal Service, and contacted the USMS office on September 28, 2022. Based on available information, the defense provided instructions on the subpoena itself directing the USMS to attempt service after 6 p.m., when Mitchell would likely be home. That instruction was ignored, and the USMS made one attempt in the early afternoon of October 7, 2022, hours prior to 6 p.m. Mitchell was never subpoenaed, and the jury never heard her statement that Hernandez was the person who spoke with Polk and Matthew prior to shooting them.

Despite having credible contrary information from two unbiased eyewitnesses, government agents never confronted Hernandez about this discrepancy. Then the government elicited contradictory testimony from Hernandez, who they already knew to be a dishonest witness. The government may argue that we do not know which version is correct. But it strains credulity to believe that Matthew and Mitchell—two unbiased witnesses—would have lied or misremembered this fact given the intensity of the experience.

Further, the amount of time (6 seconds)[3] that the vehicle was stopped did not allow enough time for Hernandez' version of events to occur. In Hernandez' trial version, (1) Rhodes

_____

[3] The prosecution stated in closing rebuttal argument that the amount of time was 9 seconds. We respectfully request that the court view Govt. Exh 94 which clearly shows that the vehicle was stopped for 6 seconds. Govt Exh 94 (exhibit time mark 9:41 – 9:47/surveillance camera time mark 2:38:02 – 2:38:08).

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

pulled up and stopped the vehicle; (2) then asked Matthew where he was from; (3) then Matthew answered that he didn't bang; (4) then Rhodes engaged with Polk, who (5) said he was 6-0 and flashed a gang sign; (6) then Rhodes handed Hernandez the gun and told Hernandez to shoot; (7) then Hernandez gained control of the gun and got it into shooting position; (8) then Hernandez shot.  Six seconds is simply not enough time for Hernandez' version to have occurred.  This is not an issue of credibility; it is an issue of common sense.  This is not a Hollywood movie where a gun can be handed over and fired within a split second.  Hernandez' account is patently incredible.  "Where testimony is patently incredible or defies physical realities, it may be rejected by the court, despite the jury's evaluation." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2nd Cir. 1992).  The obvious answer is that Hernandez already had the gun, engaged Polk and Matthew himself, and then shot at them with the gun he already had.

### 6.  Hernandez' false testimony was intentional.

It would defy common sense to believe that Hernandez simply forgot that he had been selling hard drugs and guns for years, or that he was the one who engaged Matthew and Polk before shooting them.  This was not unintentional.  If there were any doubt, Hernandez himself erased that doubt when he admitted to lying under oath.

Additionally, in a recorded jail phone recording, Hernandez stated that it would be a lie to testify that he was mentored by Rhodes and that Rhodes directed him to shoot Polk.  Impeachment Exhibit 946.  Yet that is exactly what he testified.  When that recording was played for Hernandez, this was his reaction:

Q. And -- but you're talking about a conversation you had with your lawyer; right?

---

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon  97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

A. Yeah, I guess.

Q. And you understood that they -- "they" being the prosecutors at that time in state court -- you know what they want you to say, that Mr. Rhodes, because he has a record, that he was mentoring you, that he -- that, you know -- that was his role, and you say in that "I can't lie like that"; right?

A. Right.

Q. Apparently you can; right?

A. Yeah. I don't know. That situation is different, though.

9/26/2022 Hernandez Testimony at 59. One can hardly imagine a clearer case of proof of intentional perjury.

### 7. Hernandez likely lied about other matters—only the provable lies are noted here.

Of course, there are likely other lies, given Hernandez' history of lying about facts until confronted with evidence. In the first proffer, Hernandez stated he was not at the Page shooting; when confronted with cell phone location data showed he was there, he admitted to lying. At trial, Hernandez first testified that he never sold any drugs harder than marijuana and that he never previously sold guns. He admitted to lying to the jury after he was confronted with his Facebook messages clearly showing that these were lies. Given this pattern, there are likely further lies that have not yet been exposed.

There are crucial portions of Hernandez' testimony that conflict with his own prior statements. For example, Hernandez changed key details about the gun used in the Polk shooting every time he discussed it with law enforcement. In the first proffer, Hernandez stated that he was the driver and Rhodes was the shooter. Exhibit M, Proffer 1 (8/28/2020) at 5. In the second proffer, he admitted to being the shooter and said Rhodes gave him the gun **before** they arrived at Plaid Pantry and told Hernandez he would be the shooter. Exhibit N, Proffer 2

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

(12/16/2020) at 4. In the third proffer, Hernandez stated that Rhodes gave him the gun **after** they stopped the car at the Plaid Pantry, but before engaging Matthew and Polk. Exhibit O, Proffer 3 (7/9/2021) at 2. At grand jury, Hernandez testified that Rhodes did not hand him the gun until after Kyle Polk said he was from 6-0. Govt Ex 126 at 54. Also, Hernandez testified at grand jury that prior to that, the gun was sitting on Rhodes' lap. *Id.* At trial, this detail changed again—Hernandez testified the gun was between the center console and the driver's seat. 9/23/2022 Hernandez Testimony at 101. Thus, literally every time Hernandez told the story of the Polk shooting, the placement of the gun changed. This is strong evidence of intentional perjury, yet the government still presented it at trial (and failed to record the proffers).

There are other examples where Hernandez' version of events was contradicted by unbiased witnesses and physical evidence. For example, Hernandez testified regarding the Page shooting that his car (the white Tahoe) turned around before it ever reached the Page vehicle. Yet, Elsa Arenales saw the Tahoe directly to the left of the Page vehicle while the black range rover was directly to the right. Ms. Arenales testimony was entirely consistent with the physical evidence at the Polk shooting: the location of the expended bullet cartridge cases, the bullet strikes to the Polk vehicle, and the bullet strike on the Hertz rental car (which only could have come from the vehicle occupied by Hernandez).

Another example is Hernandez' testimony that Rhodes owned the extended clip 9mm that was used to kill Kyle Polk. No other witness corroborated this. To the contrary, several other witnesses testified that Rhodes did have a gun, but that it was a small black gun—nothing like the one Hernandez used to kill Polk. Trial Testimony of Ben Worden, Kristin Emerson, Melody Cotter. See also Exhibit G, Excerpt of Interview of Gregory Todd.

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

**C. A new trial is required because the government knew or should have reasonably know that the testimony was false.**

    **1. Going into trial, the government had ample information showing that Hernandez' trial testimony was false.**

Hernandez' past admitted lies were enough for the government to know that Hernandez was untrustworthy. This knowledge would have been amplified after hearing the repeated changes in Hernandez' story—as described above regarding the gun. Additionally, the government, had credible statements from eyewitnesses Matthew and Mitchell that contradicted Hernandez' story.

The prosecution possessed the Facebook messages for years prior to trial. Detective Clifton gathered these Facebook materials in 2016 during the state prosecution. See Exhibit A, 2016 Clifton Report. Agent Parenti independently gathered these same materials after the case went federal in 2019. Exhibit B, 2019 Facebook warrant; Exhibit C, FBI report on warrant return. Further, as noted, there was much more evidence of these lies than were exposed in cross-examination. The Facebook messages show evidence of Hernandez selling drugs and guns as far back as 2014. Exhibits H, I, J, K, L, Hernandez Facebook messages 2014-2015. The government had access to all this material prior to trial and therefore knew that Hernandez was not merely untrustworthy—Hernandez was likely to commit perjury at trial.

    **2. The government continued to rely on Hernandez' perjured testimony even after he admitted that he lied under oath.**

The government continued to rely on Hernandez' testimony even after it was shown that he committed perjury. This included reliance on specific areas where Hernandez admitted he lied. The government first attempted to rehabilitate Hernandez' credibility through Agent Parenti, whom the government called shortly after Hernandez testified. Through a lengthy line

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

of questioning, the government attempted to show that Hernandez' admissions of lying were

overstated. That questioning included this exchange:

> Q. Now, as somebody who sat in on those proffers with Mr. Hernandez, did it surprise you yesterday when Mr. Hernandez agreed with Mr. Kim that he lied about certain facts?

> MR. KIM: Objection.

> THE COURT: Surprise is not relevant. He is not to speak to the credibility of this witness. He's vouching. That's not going to happen.

> MS. BOLSTAD: Okay. I'll rephrase.

> THE COURT: Folks, you are the ones who will determine credibility. Other witnesses are not going to determine credibility for you about another witness.

> 9/27/2022 Testimony of Agent Parenti. Ms. Bolstad continued a bit later:

> Q. Okay. Do you think it got a little confusing yesterday about the first proffer versus grand jury?

> MR. KIM: Objection, relevance, it's not --

> THE COURT: Sustained. His confusion is not relevant to this case.

> MS. BOLSTAD: Let's look at the grand jury transcript please, top of page 51.

> THE COURT: Folks, I just want to clarify. These statements are coming in not as -- that you are to accept them as true statements. They're coming in because inconsistent statements were presented to Mr. Hernandez and that allows the government to also present some consistent statements that may have been made in the past by Mr. Hernandez.

9/27/2022 Testimony of Agent Parenti. Despite the court's admonition and instruction,

commenting on the credibility of their most important witness is exactly what the government

was attempting to do throughout this line of questioning. But as we have argued above,

Hernandez' issues go far beyond credibility because his false testimony was proven—and he

admitted as much.

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon  97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

Further, the government's rehabilitation of Hernandez through Parenti by discussing some consistent statements do not excuse the elicitation of false testimony. Hernandez was consistent largely about issues that were not in dispute—such as that he and Rhodes were in a car together. Dwelling on irrelevant consistent statements only served to confuse and distract from the false testimony. The government argued that Hernandez over owned his lying, suggesting that Hernandez was a naïve victim of Mr. Kim's overzealous lawyering. Mr. Kim's cross-examination may have been excellent, but there was nothing tricky about it. It was effective because it was backed up with evidence that Hernandez could not deny.

In closing arguments, the government continued to rely on Hernandez' testimony and asked the jury to believe him.

### 3. The dropped witnesses show that the government knew there was substantial evidence showing that Hernandez' testimony was false.

After Hernandez' testimony, the government dropped several key witnesses from their witness list. One was Deonna Mitchell, who—if she testified consistently with her statements to police—would have directly contradicted Hernandez' story that it was Rhodes who talked to Matthew and Polk. She was present at the time and told police it was the younger passenger of the vehicle who spoke with Polk and Matthew before starting to shoot. As noted above, the defense attempted to subpoena her, but was unsuccessful. Mitchell never testified, and jury never heard her statement that it was Hernandez was the person who spoke with Polk and Matthew prior to shooting them.

Another witness dropped by the government was Luis Pos-Planas (aka "Cuba"). Hernandez testified extensively about Cuba—including that he and Rhodes were at Cuba's house when they received a call from Corey Hudson to come to the Plaid Pantry.

A third witness dropped after Hernandez' testimony was Gregory Todd, who—if he testified consistently with his statements to police—would have testified that Rhodes forgot his small black gun in the van driven to Salem. Showing that Rhodes still had his gun—and did not throw it into the Columbia River—would have tended to contradict Hernandez' story that Rhodes had an extended clip 9mm gun that he handed to Hernandez prior to the Polk shooting. The fact that Rhodes still had his gun after the Polk shooting tends to support the defense theory that Hernandez acted on his own—with his own gun—to shoot and kill Kyle Polk.

Finally, after Hernandez' testimony, the government also dropped the testimony of Cynthia Scholer. Hernandez testified about Ms. Scholer extensively, explaining that he lived in her house after meeting Rhodes. If she testified consistently with her previous statements to law enforcement, Scholer would have testified that immediately after the shooting, Rhodes was upset and crying about Hernandez killing Polk and that he was surprised that Hernandez initiated the shooting.

Therefore, it certainly appears that the government knew that there was substantial evidence available that would contradict Hernandez' account in numerous ways. The government decided to forgo these witnesses. That decision is circumstantial evidence that the government knew that Hernandez had committed perjury and was attempting to mitigate the credibility problems that Hernandez had created for the government. These witnesses would have tended to support the defense theory that Hernandez owned the 9mm all along; that Hernandez used it at the Page shooting; that Hernandez used it two days later at the Polk shooting; and that Rhodes not only did not order the shooting—he was shocked and upset when it occurred. Further, the fact that the government knew about these witnesses for years means

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

that the government knew there was strong evidence contradicting Hernandez—and that Hernandez was likely lying about virtually his entire account of the shooting.

### 4. The prosecutor made several false statements of fact during its closing argument.

In their zealous advocacy during closing arguments, the government made false or misleading statements related to Javier Hernandez and his testimony. This further exacerbated the prejudice of Hernandez' false testimony.

First, in rebuttal argument, Ms. Bolstad stated in relation to the Polk shooting that the Chevy Tahoe was stopped in front of the Plaid Pantry for 9 seconds and that Mr. Kim was wrong when he said it was 7 seconds. The evidence, though, shows that Ms. Bolstad was wrong. In fact, Mr. Kim was generous. Government's Exhibit 94, the surveillance camera from the Astro station across the street, has the clearest view of the vehicle and shows that the car was stopped for only 6 seconds. The car comes to a stop at 2:38:02 (surveillance video time) and is already racing away by 2:38:08 (Exhibit time is 10:41 – 10:47). This misstatement of fact is crucial because it could be the difference between believing that Hernandez' story was possible or that it was impossible. As we have argued above, relating to Hernandez' testimony of what happened, nine seconds is a stretch, but six seconds is impossible.

Second, Ms. Bolstad told the jury in her rebuttal argument (when the defense would have no opportunity to respond) that Hernandez did NOT lie in his grand jury testimony and that Mr. Kim surely would have shown the lie if there had been one. This statement was made after it was shown that Hernandez lied at grand jury and after Hernandez admitted to doing so.

As discussed above, there were at least three **provable** lies in Hernandez' grand jury testimony. First, Hernandez' testimony that he never sold drugs other than marijuana prior to

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

meeting Rhodes and joining the Hoovers.  Second, his testimony that he only sold two guns, and

they were during his time with the Hoovers.  Third, his testimony that Rhodes was the one who

engaged and spoke with Polk and Matthew just before the shooting.  The first two lies were

proven by Hernandez' Facebook messages and then admitted to by Hernandez.  The third is

proven by the testimony of Javonni Matthew, the statements of Deonna Mitchell, and by the

impossibility of Hernandez' account.

Ms. Bolstad's statement to the jury at the very end of closing arguments that Hernandez

did not lie at grand jury is important because it shows that—even after Hernandez admitted to

lying under oath at grand jury—the government still asked the jury to accept the testimony and

use it to convict Mr. Rhodes.  Further exacerbating the prejudice, virtually the entirety of

Hernandez' grand jury testimony went back to the jury room in Govt Ex 126.

**5. The evidence showing that Hernandez' testimony was false was known to the government before they elicited the false testimony.**

Many of the cases discussing perjured testimony involve new evidence that exposed the

perjury.  In this case, the government and the defense already possessed the evidence showing

that material aspects of Hernandez' testimony was false.  The government may argue that they

are insulated because they provided this evidence in discovery.  Disclosure of evidence showing

that a witness has lied in the past may satisfy the government's obligations under *Brady v.

Maryland*, 373 U.S. 83 (1963), but it does not give the government license to elicit false

testimony at trial.  Advance notice does not transform a conviction obtained through false

testimony into a fairly obtained conviction.  Rather, the discovery shows that the prosecution

knew that the testimony was untruthful.

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon  97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

**D. A new trial is required because the false testimony was material and there is a reasonable probability the result of the trial would have been different if it had not been presented.**

1. **The perjured testimony regarding selling drugs and guns is material because it relates to the conspiracy and to crucial details about the alleged VICAR murder.**

The perjury relating to selling drugs and guns is directly material to the RICO Conspiracy charge as well as the VICAR charge. The government's narrative at trial was that Rhodes had recruited Hernandez into the gang, taught him how to sell drugs, and groomed him as a Hoover and a criminal. This narrative is directly connected to Hernandez' testimony that Rhodes handed him a gun and told him to shoot Kyle Polk. The truth was far different—Hernandez was deeply into selling all sorts of hard drugs and firearms long before meeting Rhodes or becoming a Hoover. Hernandez was acting on his own while he was selling drugs and guns; he was acting on his own when he shot Kyle Polk.

Hernandez' false and changing statements about Rhodes' status as an important higher-up in the Hoovers, Def Ex 434; Hernandez' testimony regarding the Page shooting, Def Ex 433; and the Polk homicide (as described above) are also material, and the government reasonably should have known of the risk of false testimony in those areas as well.

The false testimony about the Hernandez' purchase and sale of various firearms is related to the Polk homicide in another way. Hernandez testified that the 9mm used in the Polk murder was bought by Mr. Rhodes and only handed to Hernandez in the seconds before Hernandez shot Polk. Other evidence suggested that Rhodes had a smaller black gun and that the 9mm likely belonged to Mr. Hernandez. Witnesses testified that Rhodes always had a little black gun in the car and that he still had it after the Polk homicide. The extended clip 9mm would have looked nothing like the small black gun that others described as belonging to Rhodes. Given the defense

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

theory that the extended clip 9mm belonged to Hernandez, the false testimony about guns that

Hernandez had bought and owned in the past is especially relevant and material.

> **2. The testimony of Javier Hernandez—including the false testimony—was crucial to the government's case against Mr. Rhodes.**

The importance of Hernandez' testimony to the government's case is demonstrated by

their persistent reliance on it—even after it was shown that he lied under oath.  For example, the

government's Response to Defendant Rhodes's Motion for Judgment of Acquittal [ECF 513]

relied almost exclusively on Hernandez' testimony:

> With respect to the Polk murder, this evidence consisted largely, but not solely, of testimony from Javier Hernandez that he shot Polk on Rhodes's command in a drive-by murder.  Hernandez testified that Hoovers were hunting rivals in retaliation for the December 12, 2015, shooting of Hoover Leonard Brightman. Two days later, Hernandez and Rhodes are involved in the attempted murder of a rival by the name of Deandre Page for their initial retaliation to the Brightmon shooting.  Days later, Hernandez and Rhodes drove a rented while Chevrolet Suburban to a drug source's apartment.  While there, they received calls from high-ranking Hoover Corey Hudson, who told them he had seen a rival gang member and implied he wanted to retaliate. Hudson told them to meet him at a Plaid Pantry, and then instructed them to check out two males who were standing outside the Plaid Pantry.  Rhodes drove the vehicle towards the Plaid Pantry with Hernandez in the front seat as they discussed the plan with Hudson while the phone was on Bluetooth audio in the vehicle. Rhodes stopped the vehicle in the middle of the street.  One of the men was wearing blue. Hernandez testified that Rhodes asked the men where they were from and if they banged, then gave Hernandez a Glock with an extended magazine and told him to shoot.  Hernandez shot several times; Rhodes drove away from the scene and stopped at the I-205 interstate bridge where he threw the gun into the river.

ECF 513 at 15-16.  By the government's own admission, their case rested largely upon the

testimony of Hernandez.  The government argues that there is other evidence that "corroborates"

Hernandez' testimony, but this other evidence mostly only corroborates what was not in

dispute—that Rhodes was in the car and driving when Hernandez murdered Kyle Polk.  None of

the other evidence corroborates crucial portions of Hernandez' testimony—such as whether

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon  97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

Rhodes ordered Hernandez to shoot; whether Rhodes handed Hernandez a gun; whether Rhodes ever had the extended clip 9mm at all; whether the shooting was ordered by Corey Hudson; whether the murder was committed in retaliation for Leonard Brightmon being shot; whether the murder was committed in furtherance of the racketeering conspiracy; whether Rhodes had any advance warning that Hernandez would shoot Polk; whether Rhodes participated at all or was "merely present."

Simply put, without the Hernandez testimony, the government's case against Mr. Rhodes falls away. Under the second prong of the new trial analysis under *Young*, even if the government presented the false testimony unwittingly, "there is a reasonable probability that [without the evidence] the result of the proceeding would have been different." *Young*, 17 F.3d at 1203-04.

Importantly, the effect of the false testimony should be considered together, not separately. The Ninth Circuit explained that analyzing the prejudice of perjurious statements separately does not comport with the *Young* standard:

> The district court analyzed each of the perjurious statements separately. It found the level of prejudice suffered as a result of each individual statement insufficient to conclude that a reasonable juror would have had doubt about his or her verdict. The main reason offered for this conclusion is that Killian's conviction was not based on any "material" perjured testimony. According to the district court, the perjuries were irrelevant because none "clearly" touched on Killian's involvement in prior discussions with Masse. And because conspiracy is "in for a penny, in for a pound," the district court thought the conviction should stand, since Masse never recanted on Killian's purported initial involvement.
>
> The district court cited no authority to justify applying the materiality standard so narrowly, but our task is to consider all of Masse's lies, not just those about which the prosecution may have known. Under the *Young* standard, we must determine whether there is a reasonable probability that without all the perjury the result of the proceeding would have been different.

*Killian v. Poole*, 282 F.3d 1204, 1209 (9th Cir. 2002).

### 3. The conviction on Count 7 shows that the jury did believe Mr. Hernandez

The government may argue, as it has previously, that the jury need not have believed Hernandez' testimony to convict Rhodes of RICO Conspiracy (Count 1) and VICAR murder (Count 6). This argument fails for at least two reasons. First, without Hernandez' testimony, there is far too little evidence to convict Rhodes beyond a reasonable doubt of the VICAR murder. Without Hernandez' testimony, the most the government could prove is that Rhodes was present. As the jury was instructed, "Mere presence at the scene of a crime or mere knowledge that a crime is being committed is not sufficient to establish that a defendant committed the crime of murder in aid of racketeering."

Second, it is apparent that the jury did in fact use Hernandez' testimony to support its findings of guilt. The jury found Rhodes guilty of Using and Carrying a Firearm in a Crime of Violence (Count 7). There was **no** evidence outside of Hernandez' testimony upon which to base a conviction on that charge. Thus, it is clear that Hernandez' testimony was not only perjurious—but effective.

### E. The government's introduction of highly prejudicial conduct unrelated to the alleged RICO conspiracy compounded the prejudice of Hernandez' false testimony.

The government presented testimony of cooperating witnesses who described in detail, highly inflammatory and prejudicial acts of violence that were entirely unrelated to any of the charged conduct against the defendants. This testimony was extremely prejudicial and was the government's flagrant attempt to lump all gang members (and even some non-gang members) into the alleged Hoover conspiracy. For example, government cooperating witness Keith Woody testified that he was not a Hoover gang member and then described in detail criminal conduct committed personally and with other non-Hoover individuals. Woody committed crimes with

Page 32 of 38 – DEFENDANT RHODES MOTION FOR NEW TRIAL / MJOA

Hoovers, members of gangs other than Hoover, and with non-gang members. Seth Stephens was another cooperating witness who was never a member of the Hoovers.

Pretrial, Rhodes moved to exclude this evidence as irrelevant and prejudicial. ECF 365. The government argued to the Court that the government could prove this testimony was a part of the alleged Hoover conspiracy. At trial, however, the government failed entirely to establish any link between many of the offered criminal acts and the alleged Hoover racketeering conspiracy. The admission of highly inflammatory testimony and video evidence of unrelated Black men committing acts of violence in a trial against two other Black gang members has an obvious prejudicial impact.

Not every piece of erroneously admitted evidence warrants a new trial. However, "what the applicable rule means, as every experienced trial judge understands, is that errors in admitting evidence ordinarily can and should be cured by striking the evidence and instructing the jury to disregard it, but that there can be exceptional situations in which such errors are incurable." *Dolan v. United States*, 218 F.2d 454, 460 (8th Cir. 1955). The testimony in this case constitutes an exceptional situation that requires a new trial.

## II.     MOTION FOR JUDGMENT OF ACQUITTAL

### A.  Legal Standards for Motion for Judgment of Acquittal

A motion for judgment of acquittal may be made after the government's case-in-chief, before submission to the jury, or after discharge of the jury. Fed. R. Crim. P. 29. The standard for determining whether a motion pursuant to Rule 29 should be granted is whether the evidence, viewed in the light most favorable to the government, would permit any rational trier of fact to conclude that the defendant is guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon  97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

307, 318-19 (1979); *United States v. Barker*, 967 F.2d 1274, 1276 (9th Cir. 1991). "Although circumstantial evidence alone can support a conviction, there are times that it amounts to only reasonable speculation and not to sufficient evidence." *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008). See also *O'Laughlin v. O'Brien*, 568 F.3d 287, 301 (1st Cir. 2009) (noting that there are "some limits" to the probative value of circumstantial evidence, and that a reviewing court should not give credence to evidentiary interpretations that are "unreasonable, insupportable, or overly speculative.").

Where there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt on each and every element of the charged offense, a judgment of acquittal is required. *Id*.; *see also United States v. Cassese*, 290 F. Supp. 2d 443 (S.D.N.Y. 2003) (granting motion for judgment of acquittal following a guilty verdict by the jury and after the court had twice before denied defendant's motions for judgment of acquittal). The law is clear that when the evidence equally supports an inference of innocence and of guilt, a reasonable jury must necessarily entertain a reasonable doubt. *United States v. Delgado*, 357 F.3d 1061, 1068 (9th Cir. 2004) (citations omitted); *see also United States v. Glenn*, 312 F.3d 58, 70 (2nd Cir. 2002) ("if the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt'") (citation omitted); *United States v. Bishop*, 959 F.2d 820, 831 (9th Cir. 1992) ("When a defendant's behavior is entirely consistent with innocence, the government must 'produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the defendant [in fact engaged in criminal conduct].") (citation omitted).

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

Where a reasonable jury would have found reasonable doubt on a charged offense, a judgment of acquittal is warranted. *United States v. Jensen*, 141 F.3d 830, 833 (8th Cir. 1998) ("In reviewing a challenge to the sufficiency of the evidence, we may reverse a jury's verdict only where a *reasonable fact-finder* must have harbored reasonable doubt relating to the government's proof on at least one of the essential elements of the offense.") (emphasis added). While the Court may not, under Rule 29, weigh the evidence nor assess the credibility of witnesses, *Burks v. United States*, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978), the state of the evidence may be so overwhelming in favor of the defendant as to a critical element of the charged crime as to require the Court conclude that no reasonable juror could have found the defendant guilty beyond a reasonable doubt.

## B. The evidence was insufficient to convict Mr. Rhodes beyond a reasonable doubt of RICO Conspiracy

Although there was evidence showing that Mr. Rhodes was a Hoover, there was insufficient evidence to prove that Mr. Rhodes was guilty of RICO Conspiracy. As the jury was instructed, "It is not a crime simply to be a member of a gang." Many of the specifics of Mr. Rhodes' membership in the Hoover gang were based on the testimony of Javier Hernandez. As we have argued above, much of that testimony was materially false and cannot provide the basis for upholding Mr. Rhodes' convictions.

To find Rhodes guilty of the RICO Conspiracy, the jury was required to find beyond a reasonable doubt that Rhodes agreed that at least one conspirator "would intentionally commit, or cause, or aid and abet the commission of two or more racketeering acts." Further, the jury was required to find that "the acts of racketeering would be related to each other and have a meaningful connection" to the Hoover gang. Even in the light most favorable to the government,

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

this was not proven beyond a reasonable doubt. There was no evidence that Rhodes attended

any Hoover meeting; there was no evidence that his drug selling activities in any way benefited

the Hoovers; there was no evidence that Rhodes' identity as a Hoover involved any agreement

that another person would commit any of the alleged racketeering acts. While the government

presented much evidence of crimes that were within the categories of drug trafficking, robbery,

and acts of murder, the government did not present adequate evidence that Rhodes personally

agreed to these acts, or even that he knew that they would occur.

Mr. Rhodes reiterates and incorporates his arguments in his previous motion for

judgment of acquittal. ECF 510. Mr. Rhodes also joins Lorenzo Jones' motion for judgment of

acquittal, ECF 547, and adopts the arguments therein.

### C. There was insufficient evidence to prove beyond a reasonable doubt that Mr. Rhodes' participation in the murder was in furtherance of the conspiracy.

As discussed above, the guilty verdicts in Counts 6 and 7 relating to the death of Kyle

Polk were almost exclusively based on the false and unreliable testimony of Javier Hernandez.

To prove the VICAR murder in this case, the government relied almost exclusively upon

the testimony of witness Javier Hernandez, who admitted to lying repeatedly to prosecutors, law

enforcement, under oath at grand jury, and under oath to the jury at trial. As noted above,

without the Hernandez testimony, the government's case against Mr. Rhodes falls away.

This is particularly true with respect to the element of VICAR murder which requires the

government to prove beyond a reasonable doubt that Mr. Rhodes' purpose in committing this

murder was to gain entrance to, or to maintain, or to increase his position in the enterprise. To

make that finding, the jury would need to have found that maintaining or enhancing Rhodes'

status in the Hoovers was a substantial purpose or that he committed the charged crime as an

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

integral aspect of membership in the Hoover Gang. Without the false and unreliable testimony

of Javier Hernandez, no reasonable jury could make this finding beyond a reasonable doubt. If

the jury did use Hernandez' testimony, then that was unreasonable because it relied on perjured

testimony.


## III.     *NAPUE V. ILLINOIS*

In addition to the above arguments relating to a motion for judgment of acquittal under

Rule 29 and motion for new trial under Rule 33, Mr. Rhodes reiterates the arguments he offered

in his Motion Relating to False Testimony at Trial [ECF 509], which were based on due process

as discussed in *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Under *Napue*, "a conviction

obtained through use of false evidence, known to be such by representatives of the State, must

fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269. "Indeed, if it is established that

the government knowingly permitted the introduction of false testimony reversal is 'virtually

automatic.'" *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (quoting *United States

v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975)). In *United States v. Rodriguez*, the Ninth Circuit

recently reiterated its prior holdings that: "A conviction obtained using knowingly perjured

testimony violates due process, even if the witness's perjured testimony goes only to his

credibility as a witness and not to the defendant's guilt." 766 F.3d 970, 990 (9th Cir. 2014)

(quoting *United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011) (citations omitted). The

government's elicitation of Mr. Hernandez' testimony in this case meets this standard.

While this Court had previously noted that Hernandez had repeatedly lied during the

course of this case, this Court denied the *Napue* motion. However, this Court also noted that

there were "legitimate concerns," and stated that the issue could be raised post-trial if necessary.

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon  97214
Phone: (503) 701-3188 / bert.dupre@gmail.com

No reasonable jury should have credited Hernandez' testimony at all, and this court should have acted as a gatekeeper and kept it out. As argued above, this goes far beyond a credibility issue. Here, there is direct proof of lying under oath and the witness has repeatedly admitted to lying under oath. Unfortunately, the jury did credit Hernandez' testimony—which we know because they found Mr. Rhodes guilty of Count 7, which could only be based on Hernandez' testimony. The jury's use of that testimony to convict Mr. Rhodes was unreasonable. Due process requires that this court grant a new trial. *See Napue*, 360 U.S. at 269.

## IV. RELIEF SOUGHT

The perjured testimony of Javier Hernandez infected the entire trial as to Mr. Rhodes. For the foregoing reasons, Mr. Rhodes respectfully requests that this court either grant a judgment of acquittal or new trial on all counts.

Dated December 9, 2022.

/s/ Bert Dupré                          /s/ Benjamin B. Kim
Bert Dupré                             Benjamin B. Kim
Attorney for Defendant                 Attorney for Defendant
Ronald Rhodes                          Ronald Rhodes

Bert Dupré, Attorney at Law
4110 SE Hawthorne Blvd, #238, Portland, Oregon 97214
Phone: (503) 701-3188 / bert.dupre@gmail.com